Good morning. If it pleases the court, my name is Vic Glassberg. I represent George Wingate. George Wingate's check engine light came on at two o'clock in the morning as he was driving south on Jefferson Davis Highway. He pulled over at the first street light he saw and he stopped. He left his headlights on, his rear lights were on, and he opened his hood. I'll get back to these points because there are elephants in the room that were completely ignored by the district court in its ruling and by defendants in their brief. Officer Fulford was traveling on route Jefferson Davis Highway and he saw the car. He recognized it as a car in distress. He stopped to help and as he told Mr. Wingate, this is at page 52 of the appendix, I drive by and I see someone with the hood up, so guess what I'm going to do as a police officer? I'm going to pull over and I'm going to try to help that person. And he also told Mr. Fulford, excuse me, Mr. Wingate, and you can hear this, exhibit five, that's the video disc at three minutes and five seconds. It's also at page 110 where it was transcribed. I don't doubt for a minute, ma'am, that you're having trouble. Nevertheless, the first thing that preoccupied me was getting Wingate's name and George Wingate was initially detained because he did not give his name. I can't sufficiently exaggerate the importance of the video. Exhibit five is five minutes worth of which will inform everything I say. Officer Fulford understood the constitutional standard. In his deposition, this is at page 97, I asked him, is it right that he has to be, there has to be reasonable suspicion that he committed a crime, that he was committing a crime or that he was about to commit a crime. Is that correct? Correct. And it was at the point that he refused to give his name that officer Fulford turned on his mic and requested backup. That's at page 74 and 75 of the appendix. It was because he didn't give his name. Now, when officer Pinzon came on the scene, officer Pinzon told him, and this is in the appendix at page 56. And again, you can hear it on the video. You're committing a crime now because you're required to give us your name. In its decision, the district court correctly stated the standard. The appendix at page 43, the question becomes whether deputy Fulford had constitutionally sufficient suspicion of criminal activity to warrant an investigatory stop of Mr. Wingate. And that's a proposition that receives de novo review of this court under United States versus Powell. Here was the district court's justification. It's short and please permit me to read it. Critical to that determination, namely the determination that there was reasonable suspicion is the time of the encounter early morning and the location of Mr. Wingate's vehicle, namely partially on a private used car lot adjacent to used cars of a closed business that had been the victim of criminal activity in the past. And then a time when vehicular related crime had spiked throughout the county. By the way, the county is 280 square miles and that's in the record. Without these facts, the court said, without these facts, the court would reach a different conclusion. That was the district court's Terry ruling. But for those facts, there would not have been no valedictory stop as the district court construed it. Now, the deputies added on some additional facts. I will address some of them, but I would like to start by addressing the district court's ruling, which I submit is subject to both legal impeachment and factual impeachment. In terms of the legal standard, I quote from United States versus Black, a decision of this court 2013. This court has quote, repeatedly emphasized that to be reasonable under the fourth amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. In other words, the suspicious facts must be specific and particular to the individual seized. The points raised by the district court were the following. The time of night, that's not individualized. The fact that there was countywide vehicular crime, that's not individualized. The fact that this happened in a used car lot. Well, anybody who could have been in that lot would have been in the same position. I respectfully submit that the court's reliance on the three factors that it named as essential, without which it could not have found reasonable suspicion, do not permit that determination. Now, I said that there was a factual impeachment as well. And the factual impeachment is the based on those facts, Fulford did reach a different conclusion. The conclusion he reached on seeing the car at two in the morning, in the dark, in that lot was based on his training and experience that he had encountered a disabled vehicle. That's what he called into the dispatcher. That's what he told George Wingate that he came to stop the help. And that is what he told George Wingate at page 110 of the appendix. And again, it's on exhibit five and you can hear it all. I urge you to hear it all. I don't doubt for a minute, man, that you're having car troubles. So, Mr. Glassberg? Yes, sir. Mr. Glassberg, when do you contend that Terry's stop occurred? At what point in this scenario? Immediately when Deputy Fulford told Mr. Wingate that he was not free to leave. Now, initially, you'll see it again, right at the beginning of the video. He says, give me your name. I don't feel any need to give you my name. Well, then he asks, am I detained? First, he said, no, you're not detained. Am I free to leave? No, you're not free to leave. As of that moment, sir. And that is what the district court found. And I respectfully submit that was a proper finding. And thereafter, Mr. Wingate acted in accordance with that but that's not germane to the issue before the court. So, my first point is that on the district court's own analysis that without those facts, the court would reach a different conclusion is impeached not only legally because he relied on matters of general application and not- So, if I understand your argument, then the challenge is that there was not a reasonably articulable grounds for conducting a Terry stop. Yes, sir. The arrest was all right, but not the Terry stop. Is that what I understand? No, sir. The arrest, as Officer Pinzon says, and you can see it in his own statement, Officer Pinzon on page 56 of the brief, you are committing a crime right now because you're required to give us your name. Please keep in mind, this man was arrested because he didn't give his name. He was not- I understand. Could he be arrested for not giving his name under the statute? I don't believe he could because there's absolutely no basis for concluding that there was a man who- So, you're challenging both the Terry stop and the arrest, the probable cause for the arrest? That's correct, sir. Okay. Can I ask, just so I understand? Yes, sir. It seems like there are two different ideas there. One, you say there's no reasonable suspicion, and I understand that argument, but it seems like you're also saying there was no reason to believe that the public safety required him to give his identification. It would either of those be sufficient, right? So, if there was reasonable suspicion of a crime, then you can request identification, right? And so, that's a standalone ground. Or, if an officer reasonably believed that public safety required identification, maybe it's unconstitutional, but at least the statute authorizes an officer to request the identification. And so, either of those would be sufficient. The statute would be sufficient if it were constitutionally applied. The statute by itself cannot trump the Fourth Amendment's requirement of reasonable suspicion. So, if there were reasonable suspicion or circumstances suggesting that there was a threat to public safety, then the two would merge. We have not brought a facial challenge to that statute, although it can be unconstitutionally applied, and here it was. But what I'm asking is, if an officer, and maybe this isn't an issue here, but I'm just understanding how these two fit together. If an officer believed that public safety required identification, say no crime, but no crime, right? So, if somebody's having a heart attack or there's a medical emergency, and so they say, we need identification because we need to know whether you're allergic to bee stings or whatever it is, right? But public safety legitimately demanded it, but there was no reasonable suspicion of a crime at all. Everybody agrees there was no crime. That reasonable suspicion or a reasonable belief that public safety required identification would be sufficient in this, you know, my bee sting hypothetical. It would for the same reason that the Fourth Amendment does not block any number of police intrusions to help people. A police officer doesn't need a warrant to break into a somebody medically, but this is a purely criminal matter. This isn't the bee sting. And as I say, we have not challenged the constitutionality of the ordinance. And in fact, we haven't brought the county in as a defendant. I believe that the ordinance was unconstitutionally applied in this case because this was a criminal application with no reasonable suspicion of anything. And I understand that at least it doesn't appear that this argument has been made, but in theory, if an officer at this time of night pulled up behind a car solely to provide assistance, but out of the interest of safety, wanted to provide some name to dispatch in case something bad happened on the side of the road, but there never was a criminal investigation or never a criminal thought in anybody's mind, that in theory, an officer could say at two in the morning, if I'm going to help somebody with their car, I won't dispatch to know who I'm helping. Could that be a reasonable belief that would justify requesting identification? Under Hybel, I don't think so, Judge. It's a question of the power of the officer to hold someone. He could have, well, let me step back. Yeah, he could have asked and maybe he would have answered, but if he doesn't, you can't hold him responsible for doing that without the minimal constitutional requirements that Hybel and any number of cases impose. This is, as we say, a free country and the police officer simply doesn't have the right to come up to somebody for whatever reason and say, I'd like your name. Maybe you're going to have a heart attack. Well, but why is that? And then I'll stop. Sorry, I apologize, Chief, for going over. But why is that different from my bee sting example, right? So if an officer pulls up behind a car in the middle of the night solely to provide assistance, it's not on a private lot, there's been no evidence of crime, whatever. The officer has no belief that there's any criminal activity afoot, but for safety purposes says, listen, I just want to give dispatch a name for who I'm helping. And so, you know, that's a, you know, officer safety concern. And he says, maybe under Hybel that's unconstitutional, but it's authorized by the ordinance. And then we get to qualified immunity analysis. But as far as being authorized by the ordinance, that would seem sufficient. Your point about Hybel, as I understand it, is that might be unconstitutional. But that would be a question that we would have to sort of move to the qualified immunity analysis, I assume. Is that a fair analysis? Yes and no, Judge. When you say officer safety, I have a problem with that. Certainly, if you apply it to this case, there are officer safety cases and there are cases that are not officer safety. If Deputy Fulford helped an elderly lady cross the road and asked her for her name, that's fine. There is no officer safety issue in this matter. This is a man who stopped by the side of the road. The deputy doesn't call in as well he had burglaries here, send me back up. He doesn't do that. When you look at the video, don't listen to me or my opposing counsel. Look at the video. These guys are having a chat. You don't see officer Fulford at the ready. You don't see him blade his body. You don't see him tense. You don't see him chatting with this man. Wingate goes around and closes the hood to his car. He's just standing there. Then they go back and chat. There isn't any issue. Now, of course, you will be told that it's full of potential danger or whatever. But that's all after the fact rationalization. If you look at what he said, what he said was, I'm here to help you. I don't have any doubt that you're having car trouble. He said all those things and acted. His actions speak louder than his words. His actions speak louder than his words. And that I believe conclusively demolishes any notion that Fulford was in fear at risk or anything. What got Fulford concerned was the fact that he gave an order or request and police officers are in the habit of being obeyed. I don't fault them on that. That's their job. And sometimes they don't take very well when they're not. That's what got him riled up. That is what got him to turn on his mic. That's what got him to call for backup. And everything else that has been told and was developed, excuse me, developed below is after the fact rationalization to justify the stop, which was for an innocuous piece of work. This court has a host of cases within the past 10 years in which this court has said, we keep on reminding the government, you may not criminalize innocuous behavior. You can't just patch together things that people do. The clothing people wear, all sorts of things, and then add them on. But once again, the key here is that the elements that were identified as essential by the district court simply don't support the questions. I yield my time. Thank you. Thank you, Mr. Glassberg. Mr. Frank Zanko. Good morning, your honor. Can everybody hear me okay? Yes. Okay. May I please court? My name is Alex Frank Zanko, and I represent Deputy Scott Holford and Lieutenant Dimas Pinzon. Lieutenant Pinzon was a sergeant at the time of the events, and they both were and still are law enforcement officers with the Stafford County Sheriff's Office. Before I get into my prepared argument, I do want to counter one or two things that Mr. Glassberg said, and I think he fell short in describing the district court's opinion. He's correct when he said that some of those objective factors, the time, the location, the level of criminal activity were important factors in the trial court's consideration of reasonable suspicion. But the court doesn't stop there. Although Mr. Glassberg did, the court, and this is on page 45 of the joint appendix, and I will continue reading the opinion that Mr. Glassberg, where Mr. Glassberg stopped. Judge Schreger wrote, and although without these facts, the court would reach a different conclusion. Mr. Wingate also engaged in other conduct that when considered in light of these critical facts pertaining to time, location, further justified the Terry stop, even though the conduct was insufficient by itself. And then, and then Judge Schreger identifies three things that occurred before, before he was told, Mr. Wingate was told that he could not leave the area. One, immediately exiting the vehicle without any prompting from Deputy Fulper, and there is extensive explanation as to what, how Deputy Fulper viewed that particular action, that he was distancing, Mr. Wingate was distancing himself from the vehicle, potentially hiding something. Two, wearing all black clothing similar to suspects identified and apprehended in recent late night larcenies. And three, explaining the presence, his presence regarding the engine trouble while the car, the entire time that they were there was running idly and without issue. I agree with Mr. Glassberg, when Deputy Fulper arrived at the scene, he thought... Mr. Fresenko, taking that into account, what criminal activity objectively does that reflect? In other words, the personalized conduct is getting out of the car, wearing a black clothing, and lying about the car, even though he wasn't, as it turned out, but that officer thought he was lying about the engine running. None of that is suggestive of engagement in criminal conduct, is it? Well, when you take it all into the totality of the circumstances... Well, the rest of the stuff, the rest of the stuff didn't trouble the officer, because when he came to the scene, he thought this was a disabled vehicle, and didn't report it, and he didn't act that way. I've looked at the video a couple of times and it looks to me like he's on the side of the highway, apparently where he's parking is also partially on the lot which abuts the highway, but he's right to the right of the solid white line, and he's under a street light, and he has his hood up. Now, it seems to me, if somebody's about to commit some criminal act because of the I'm not sure how that all fits, and I'm not sure the officer thought that either. The officer thought he was helping somebody, so my question is, I'd like to examine the conduct up until the time when the officer said, you can't leave, and there was an exchange where the plaintiff said, have I committed a crime or anything? The officer said no, and he said, then I'm free to go, and the officer says, identify yourself. He didn't say yes or no, and the plaintiff then says, am I free to go? And the officer says, not right now. Am I being detained? No. Am I free to go? No. So we all agree that's the basis for the officer detaining a citizen without a suggestion that there's a crime being committed or has been committed. The location of the vehicle, the time of the night. I understand, but that's not individualized. I mean, every human being going through that location could theoretically be stopped on that basis. So the question is, how do you pick out a disabled vehicle to suggest that the crime's being committed as opposed to anybody else who's there? Because not everybody would be stopped right there next to the lot. If you're going to commit a crime at a used car lot in the middle of the night, this is a very, and you can see from the video as well, there's nothing else around there, your honor. This is it. A reasonable officer comes there, the guy's in a car with his hood up under the light, and he says his engine light came on, and the officer you think would think that he's about to steal a car off the lot when he's got his own car parked there. He does not have an accomplice, so he's going to be driving two cars, right? The one he's stealing and his own, or he's going to leave his own behind and steal another one. I'm trying to figure out what's in the reasonable officer's mind, and my put together on this is that he came to help the guy, and he was cold, he was casual, but he didn't want to identify himself for whatever reason. But the question is, it was converted into almost an ego battle between the officer and the plaintiff. That's what it looks like. And your honor, the premise that he was going to steal a car wasn't the basis for some of the suspicion here. What was happening was that kind of like converters, parts were being stolen. So when you have a vehicle that's within a couple of feet of these parked used cars, I mean, he could have chose a different location, but he was right next to these cars. What converted the conclusion reached by the officer that this was a disabled vehicle that needed help to the notion that this is a disabled vehicle ready to commit a crime? What conduct transformed the stop from an assistance to a side roadside to a suspicious person? When did that occur in this exchange? One of the things that your honor said that he was under the hood when this happened. That's not that's not I didn't say that. No, I'm not. He raised the hood. The hood had been up. The hood was up. Yes, your honor. Yeah. But Mike, I have a question. My question is, at what point did the officer reasonably conclude that the situation changed from what I thought was a disabled vehicle sitting on the side of the road who at which I had to help to a situation where I now have a person I suspect of a crime? At what point in the dialogue? The three points and I agree with the lower courts. Now, this is a finite time. Just tell me. I have the dialogue in front of me. I just want to know at what point in time in the conversation did the officer conclude that I think this is a suspicious criminal person with criminal suspicion? I think when he refuses to give his name and after again, after he exits the vehicle after. Look, that's totally consistent with disability. If you have been speeding, you usually hunker down and stay in the car and wait for the officer. But you're on the side of the road, your engine lights off or you have a flat tire and you're sitting in the car or you're standing next to the car. And when the officer comes up, you walk the officer, say, I got a problem. Now, the officer could have said, what's the problem? He says, my engine light comes on. The officer could have said, well, I hear it running. And he didn't ask, how's it running? And the engine lights coming on. The next answer would have been what he had in his hand, this cell phone, which reads his computer readout in the car. And apparently he had a one cylinder that wasn't firing right. But the officer didn't know that. He gets the benefit of believing that that was a lie. But that's the that's the most that's the most egregious conduct he got up until the time he told him he couldn't leave. It was that the officer, in my judgment, the officer started changing his views about the situation when the guy said, I had an engine light problem and the engine was running. But the question is that is that suspicion of a crime? That was one of one of the factors. Again, there was there was three that were attributable to to Mr. Wingate before the suspicion began, because, again, it did not. Deputy Colfer didn't simply arrive there and assume that a crime was committed. No, he got out of his car and it was his, again, perception that when he came when Mr. Wingate came out of the vehicle, that was odd. It was his perception that when he was dressed all in black clothing, that was that was a little bit odd at two o'clock in the morning. Why didn't why didn't he react that way? He didn't react that way. He reacted. How can I help you? What's the problem? You know, this black business is pretty chic to wear black on black. I don't know if you ever wear black khakis with a black turtleneck or something like this. But I think that gets you nowhere. I think the best thing you've got is the apparent lie about the engine trouble, because everything looked like an engine trouble problem. Yet the engine's running nicely. And so the officer could conclude and did conclude he was lying about that. And then he asked him for his I.D. But no, he said, yeah, let me have some I.D. And then you have this exchange where he says you're not free to go unless you give me an I.D. And the question is, at that point, was the officer suspecting a crime? Well, I think that when he declined the I.D., that was the last factor where there was there was some suspicion. And again, wearing black isn't a crime. I agree with the court on that point. You know, getting out of your vehicle. Well, it doesn't have to be a crime going on. You can suspect criminal conducts being planned and all the indicators are something's going to happen. You're casing the store. You're walking back and forth. You can there are circumstantial evidence that can raise suspicion. But the problem in this case that I'm having is the only crime that we have is the ordinance crime. And the ordinance crime doesn't look like that is the the stop is made. Basically, he asked for I.D. It wasn't he didn't really rely on on on that. Maybe maybe your argument has to be he asked for I.D. and the guy refused to give him I.D. and they broke broke the law. Is that it? Is that the stop? That's that's what he that's there is some debate as to when the Terry's stop actually began, because even after he was told he wasn't free to leave. But if you read the transcript, if I'm reading it correctly, if you read the transcript, I'm not sure that the plaintiff actually said, I'm not giving it to you. The plaintiff said, am I have I committed a crime? And then the plaintiff said, am I free to go? And then the plaintiff says, not right now. And then it says, am I being detained? And the officer says, you're not detained. Then a guy says, am I free to go? And the officer says, no. So they're really he had not really at least in that dialogue, he had not really said, I'm not going to identify myself. But your honor, if somebody's asked multiple times and I would say, if you watch the video, it's probably at least four to five times to identify yourself or for identification, and you don't give it constructively. Well, after that, there was a lot of there's a lot of demand for that after that, and he called back up and they asked for identification for license and everything that that's pretty clear. But that's why I asked when was the detention, the Terry stop. And the question is, all we are allowed to consider is what faced the officer up until the time the officer said, you're not free to go. Right? Your honor, correct. And up until that point, you had the objective factors of nighttime location, high crime activity, and then you have the perception that the officer had when he just wrong. Thank you. I just want to go back to just me. My question to make sure I understood your answer. Um, just me. Meyer posits that Mr Wingate did not refuse to provide an I d. Um, he had not provided it, which you say is constructive denial, but he had not actually refused to provide an I d until after the officer said that he was not free to leave. Is that Is that you're on? I think that's the right understanding of the record. But is that correct? Based on the record as you understand it, or do you argue that there's a dispute about whether he had actually refused to provide an I d or not? I'm not aware that that was actually a factual dispute in this case. Uh, you know, providing an idea after being requested I'm asking a very specific question. And Mr Wingate expressly stated that he would not provide before the officer told him he was not free to go. No, no, no. I will not give you the I d. Uh, he questioned the officer. Why do you need it? Or, you know, am I Did I do something wrong? Uh, those were those were his responses every time he was asked for identification. And then when that and then when said Sergeant Pinson arrived at the scene and again, this is before they actually took him into physical custody. Sergeant Pinson went on and even went further than Deputy Pulford did and explained to him. Listen, we've had a string of Cadillac City ordinance to Mr Wingate before he before they go forward with the arrest. And he says, under these circumstances, you know, you're currently violating this particular statute. Again, they didn't arrest him for that. That statute they were detaining him. But the whole detention continued to evolve because of the bottom line was Mr Wingate was evasive. And your Judge Nehemiah's points all these things by themselves. I agree getting out of your vehicle, wearing black. None of those things in and of itself creates suspicion. But when you throw them in, and this is what the trial court was saying when you throw them in with the time of night, with the location and with the with the with the high crime area. And then you have, to a certain extent, Mr. Fulford's subjective analysis that that Mr. Wingate was being evasive in the way he was answering his questions and ultimately about the vehicle itself having engine problems. Can I ask you about that? Can I ask you about that question? Because your colleague talked a little bit about the subjective statements on the video where he says, I don't doubt for a minute. And you too want to talk about an after the fact subjective belief. How much did those sort of calculate or factor into our analysis here? Either the contemporaneous subjective belief that I don't doubt for a minute, or what you claim is the sort of after the fact subjective belief that he was allegedly being evasive. Can we give either of those a significant weight here? Well, Your Honor, I don't doubt for a minute type statement is really his effort to deescalate the situation. He's saying that to make sure that Mr. Wingate is calm and that this situation doesn't escalate. What's the record evidence for that? Is there escalating? I don't think deceptive is appropriate description of it, but there's nothing wrong with it being deceptive, right? If he really believed the crime was being committed, right? And but he wanted to lower the temperature, he certainly could be deceptive. There's nothing wrong with being deceptive there. But what I want to know is not that you believe that might be the case, but is there evidence in the record that the officer testified later that when I said that I knew it wasn't true, but I was just trying to deescalate? Not not not attributable to that particular statement, Your Honor, but he did say that he was trying to deescalate the situation with him, especially prior to Sergeant Pinzon arriving. So the issue of this deescalation, at least on the part of Deputy Pulford, was something that was in his mind when he was dealing with Mr Wingate. So and again, I see my time is out. Are there any additional questions, or can I address any other issues that the court may have? All right. Thank you, Counsel. Thank you, Your Honor. I appreciate the time. Mr. Glasberg, you have some time reserved. Thank you. The first thing I'd like to do is address a point raised by Judge Niemeyer, who wanted to have as much clarity as possible regarding everything that was said before a determination was made by Pulford that George Wingate was required to give his name. The first thing I'd direct your attention to page is 258 to 261 of the appendix in which I went through this, but let me read where I summarized all of it. This is at page 97 of the appendix. I would like to review once again just to lock it in the factors that went into play at the time you first told him that you required his name. This is page 97. Okay. And that is that it was two o'clock in the morning that he was parked in a used car lot under circumstances where in this period of time, these months, as you have indicated, there were thefts from cars happening, that he was dressed all in black, that he had walked away from the car and towards you, that he said he had engine trouble, but so far as you could hear his car was running. These were the things that had taken place before you initially told him that he was required to give you his name. Is that correct? Correct. Okay. Were there any other factors other than the ones that I've just listed that were in play when you first told him that you listed them all? I believe that's all of them. Let me ask you this. I read some portions of the transcript that are at page 54. But the question is, do we have the transcript from the very beginning of when it was on? In other words, I'm trying to find out the fact of whether the plaintiff, in this case, Mr. Wingate, whether he refused to give identification at any point before the occasion when I read. Shortly after what I read, he did refuse because they had a discussion. Am I free to go? He says, you're not free to go. And then he said, unless I've committed a crime, I don't feel like I need to give you identification. And that was as close to his refusal, but that's after he's already been detained. The question is, before that time, is there any evidence in the record of which you're aware, where the defendant refused to identify himself? Actually said no. I can only say that he declined. I don't wish to quibble, but there is no record evidence of that. And I'm not sure that it was a casual discussion, or at least as casual as you think can be between a police officer and someone who is getting questioned by a police officer. I am unaware of any flat-out statement, and there was nothing reported to that effect. Counsel, can I ask, when I look at JA-227, and this isn't a memory test, right? I'm not trying to get you, but that's a police report that at least might be read to suggest that he refused to give it prior to the detention. Now, it's not a model of clarity. It's a police report, right? But at least, does that create a disputed fact as to whether that had occurred or not? I don't believe so, because we don't claim that he gave his name. George Wingate declined to give his name. The issue that was raised by Judge Niemeyer, and that I really don't have a clear answer to, because the transcript doesn't exist, is whether he was flat-out, said, give me your name. No, I won't do that. I can tell you that in the entire portion of which we have a video and audio, that kind of flat-out refusal doesn't happen. At a certain point after he's been detained, it does happen, but not before. He was detained for failing to give his name, if I may put it this way, rather than refusing. Well, if the transcript is correct, that I'm reading at page 54, there's a portion of the transcript that you, I guess that you're submitting as part of Mr. Wingate's affidavit, and you say this is the transcript. What follows is what was said by me and the officers when I was speaking, and he then puts forth the transcript. In that transcript, he never says he's not going to give his ID. He never declines. What he does is every time the officer says I need ID, the man asks a counter question. Did I commit a crime? Did I do something wrong? This type of thing. And the officer says, no, no. And then he says, am I free to go? And the officer says, no, until you give me your ID. Well, there's not been up to that point, even declining based on that, to give ID. It's just basically he wants to know why are you asking me for the ID? And then after a short sentence is after, he says, unless I've committed a crime, I don't feel like I need to. Now, at that point, he did decline. But that's already after the officer told him he's not free to go. In other words, I think the vulnerable point in this case is whether the Terry stop was legitimate. I think once you get past that, and you get to your argument about the arrest, I think you have a tougher time because at least under the immunity analysis, because the officer was clearly aware of a statute. He may not have applied it correctly, but he was aware of it. And he thought because the man violated the statute, he actually cited it, he could arrest him. Now, whether that's right or not, there may be holes in that. I think that is a tougher question. But I think the Terry stop, the evidence is all there, we have the evidence except the very first few exchanges between the officer and, and Wingate. We do judge but what we have in that regard is first what I read to you from page 97, which is the officer's own rendition of everything that happened in one paragraph. And we also have his rest. Excuse me. Yeah, but see, your your question was focused on, as was the officers was focused on reasonable suspicion about ongoing criminal is criminal conduct going on in the neighborhood. In other words, you're trying to find out from the officer why he thought this man was suspicious at that time and night that time a place because there's going to be tests and that type of thing. Yeah, that's totally different from the legal issue, which is seems to me the only one now that the officer has, and that is whether he committed the crime of failing to identify himself, and not the crime of potential theft or this type of thing. And, and it, it looks like your question was focused on criminal conduct afoot. Judge, at that point in the deposition, I expect I may well have been focusing on that. But the statute specifically requires a threat to public safety. And the officer, you know, you're going to argue with the officer about whether he thought the he didn't rely on that. And you didn't rely on that. And the court didn't rely on that. Nobody talked about the fact that the public safety was at risk. And I now therefore have to get his ID. What they talked about is suspicion of theft. There's no doubt about that, judge, because there's absolutely no basis to talk about public but there's an objective basis. I mean, if we're talking about immunity, there might have been a justification. The officer reasonably believed he could demand ID. And the statute, verbatim, if you go to the statute, in its words, you'd have to find some threat to the public safety or in connection and further into the public safety or whatever it is. And we would have to look at that on some, you know, you don't look at the subjective basis of what's in the officer's mind, you look at the objective with the only pushback, if I may, that it has to be reasonable. In other words, you can't just come across the situation and say, oh, there's a public safety problem. You can't do that. And I would respectfully submit that the statutory construction merges into the same analysis as applies to the constitutional reasonable suspicion standard. Okay. All right. Thank you, counsel. Thank you both. Again, we can't reach you as we would in our normal tradition, but please know that nonetheless, we appreciate the argument and thank you so much. And stay well. Thank you.
judges: Roger L. Gregory, Paul V. Niemeyer, Julius N. Richardson